(REV.5/85) Criminal Complaint

MAGGIE SCHNEIDER, AUSA (312) 353-1875

# UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

v.

SHILOH CALDWELL

FILED
3-4-08
MAR - 4 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

MAGISTRATE JUDGE
GERALDINE SOAT BROWN

CRIMINAL COMPLAINT

CASE NUMBER: 08CR 0197

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On March 4, 2008, in Cook County, in the Northern District of Illinois, defendants did, knowingly and intentionally attempt to possess with the intent to distribute a controlled substance, namely, in excess of 100 grams of mixtures containing heroin, a Schedule I Narcotic Drug Controlled substance, in violation of Title 21, United States Code, Section 841(a)(1)

in violation of Title __21__ United States Code, Section __846__.

I further state that I am a(n) Special Agent, DEA, and that this complaint is based on the following facts:
                                Official Title

See Attached Affidavit.

Continued on the attached sheet and made a part hereof:   X   Yes ___ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

March 4, 2008                          at    Chicago, Illinois
Date                                          City and State

Magistrate Judge Geraldine Soat Brown          _____
Name & Title of Judicial Officer               Signature of Judicial Officer

and recognized CALDWELL as the individual previously identified by Individual A. The CS was wearing a concealed recording device during the meeting.[3] CALDWELL asked the CS how the CS got his number and the CS explained that he got it from Individual A. During the meeting the CS stated that he has "three hundred grams of heroin" and that the price was $5,500 per 100 grams. CALDWELL indicated he didn't have the money to pay up front for the heroin and asked the CS how long he could have to pay for the heroin if the CS gave it to him on credit. The CS responded that he needed all the money for the heroin at the time of the delivery for the first transaction. CALDWELL and the CS agreed to talk later.

8. On September 26, 2007 at approximately 8:16 p.m., the CS contacted CALDWELL by phone. During the conversation, the CS stated, "I got 300 for you tomorrow." CALDWELL appeared to be nervous about talking on the phone and responded, "Hey, hey, hey, hey, hey, hey...Take it easy...Take it easy." CALDWELL then asked, "What time tomorrow?" The CS responded that he would call CALDWELL around noon.

9. On September 27, 2007, the CS met with CALDWELL inside a Target store in Cicero, Illinois. During the meeting between CALDWELL and the CS inside the Target store, CALDWELL told the CS he was nervous about receiving the heroin from the CS in the Target parking lot. CALDWELL left the Target store and parking lot without receiving the heroin from the CS. Surveillance agents observed CALDWELL enter his vehicle and then drive slowly through the Target parking lot and adjacent parking lots. CALDWELL then parked in a nearby

---

[3] For many of the recordings described herein, the statements of CALDWELL were unintelligible. CALDWELL's statements as heard on the recordings are quoted, where possible. Otherwise, the information provided about CALDWELL's statements is based on information provided by the CS.

parking lot and watched the CS from a distance as the CS sat in his/her vehicle in the Target parking lot. Based on my experience and training, I believe CALDWELL was conducting counter surveillance in an attempt to detect law enforcement in the area.

10. On October 2, 2007 the CS met with CALDWELL inside the Target store in Cicero, Illinois again. During this meeting, CALDWELL stated he wanted to receive the 300 grams of heroin from the CS at the intersection of Lake Street and Cicero Avenue in Chicago, Illinois instead of at the Target store. CALDWELL told the CS that he sensed he would be arrested shortly after taking possession of the heroin from the CS. After the meeting, I drove to the area of Lake Street and Cicero Avenue, Chicago, Illinois and observed CALDWELL driving around the area. CALDWELL was observed making U-turns in the area and driving through the area. Based on my training and experience, I believe that CALDWELL was conducting counter surveillance.

11. The reverse/undercover sale to CALDWELL from the CS was not completed at this time because DEA determined that the operation could not be done at Lake Street and Cicero Avenue due to the difficulty of positioning surveillance agents to cover the meeting without being noticed.

**B.    Heroin Transaction with Caldwell on March 4, 2008**

12. The CS left the Chicago area for a few months beginning in October 2007. When he/she returned, the CS tried to reach CALDWELL again in early February 2008 by calling the last known numbers for him. The CS left voice messages for CALDWELL at these numbers asking CALDWELL to call him/her back. CALDWELL returned the CS's calls, but would block the number from which he was calling, making it impossible for the CS to know that it was

CALDWELL calling, prior to answering the phone. Accordingly, the CS was usually not in a position to record the calls when CALDWELL called him/her back.

13. On February 14, 2008, the CS spoke with CALDWELL, but was not able to record the conversation. According to the CS, he/she told CALDWELL that he/she would have 200 or 300 grams of heroin for CALDWELL at $64.00 per gram and CALDWELL told the CS that he was interested.

14. According to the CS, on or about February 29, 2008 the CS spoke with CALDWELL on the phone and told CALDWELL that he/she would be ready to meet with CALDWELL on Monday, March 3, 2008.

15. On March 2, 2008, at approximately 6:14 p.m., CALDWELL called the CS and the CS was able to record this conversation. During this conversation, CALDWELL stated, "You're coming out tomorrow, you didn't forget, right?" The CS responded that he/she was.

16. On March 3, 2008, the CS left a message for CALDWELL and CALDWELL returned the CS's call later that day. The CS, as instructed by DEA, told CALDWELL that he/she could not meet with CALDWELL that day. The CS and CALDWELL agreed to meet the following day at Circuit City near Cermak Road and Harlem Avenue in Berwyn, Illinois.

17. On March 4, 2008, DEA Agents prepared to have the CS meet with CALDWELL to conduct a reverse undercover delivery of 200 grams of a look-alike substance, made to look like heroin, to CALDWELL. Special Agent James Laverty prepared the look-alike substance (made using "protein powder" to simulate the texture of heroin) and placed it in a plastic sandwich bag. The sandwich bag was wrapped in tape and placed the package in a brown paper bag.

18. On the morning of March 4, 2008 the CS met with agents and was provided with the use of a mini-van which contains a hidden compartment in the rear of the van, near the rear cargo door. The hidden compartment is activated by using a hidden switch which causes gears and struts to open the floor in the rear, allowing access to the compartment. SA Laverty placed the package containing the look-alike substance in the hidden compartment and then maintained visual contact of the CS and the van from that point forward. The CS was instructed how to open the hidden compartment. The CS was also equipped with a concealed recording device and voice transmitter.

19. The CS received a call from CALDWELL at approximately 11:52 a.m. This call was recorded. The CS stated he/she was stuck in traffic but was on his/her way.

20. On March 4, 2008 at approximately 1:00 p.m., as the CS was pulling into the shopping plaza where the Circuit City store is located, the CS received a call from CALDWELL. The CS stated he would be right there and CALDWELL indicated he was waiting for him/her. The body recorder worn by the CS recorded this conversation.

21. At approximately 1:02 p.m., the CS met with CALDWELL in the parking lot for the Circuit City, as observed by surveillance agents. The CS stated, "I got my gift. How long do you pay? [meaning how long before you pay for the heroin?] Two weeks? 64 right? [meaning $64.00 per gram?]" CALDWELL responded, "Sure."

22. Surveillance agents then observed CALDWELL and the CS at the back of the mini-van and saw that the CS raised the rear cargo door. The body recorder picked up the mechanical sounds of the hidden compartment opening. At that time the CS stated, "I'm going to give you two 'bananas' [meaning 200 grams of heroin]." CALDWELL sounded nervous and

6

stated, "I don't like this shit [meaning he didn't like to be standing out in the open doing the transaction]." The CS handed CALDWELL the package in the brown paper bag and told CALDWELL it was "200." CALDWELL stated, "Man, this is making me nervous." The CS stated, "Don't forget my price and my money." CALDWELL responded, "It's straight man."

23. CALDWELL then asked the CS to drive him to the other end of the parking lot in the shopping plaza. The CS drove CALDWELL west through the parking lot and let him out near CALDWELL's vehicle. Surveillance agents approached CALDWELL, while wearing police insignia and shouting "Police." At that point, CALDWELL fled on foot and ran into a Discovery Clothing store. Agents pursued CALDWELL as he fled through the store. CALDWELL knocked over clothes racks and caused customers to flee in panic for their safety. CALDWELL ran all the way through the store and into the store room in the back and then through an emergency exit. CALDWELL was apprehended a short time later from underneath a truck, where CALDWELL was hiding.

24. A manager of a store next to the Discovery Clothing store witnessed CALDWELL run out of the back of the store and toss something into a garbage dumpster behind the store. Agents retrieved a brown paper bag from the dumpster. SA Laverty inspected the brown paper bag and observed that it contained the same heroin look-alike package that SA Laverty had prepared earlier that day.

25. CALDWELL was in possession of a cell phone when he was arrested. Recent calls in the memory of the cell phone show that this phone had dialed the CS's cell phone number at approximately 1:01 PM and that the number dialed included *67 at the beginning, which is a feature that blocks the caller's number from appearing on a caller ID function.

26.     CALDWELL was transported to the Berwyn Police Department for arrest processing. CALDWELL was read a set of Miranda warnings after which CALDWELL stated he did not want to give a statement. When CALDWELL was placed in a holding cell, CALDWELL stated to the agents, "That was one of your guys wasn't it?" and laughed.

### III. Conclusion

27.     Based on the foregoing, there is probable cause to believe that SHILOH CALDWELL knowingly and intentionally attempted to possess with intent to distribute a controlled substance, namely in excess of 100 grams of mixtures containing heroin, a Schedule I Narcotic Drug Controlled substance, in violation of Title 21 U.S.C. § 841(a)(1), in violation of Title 21, United States Code, Section 846.

Further Affiant Sayeth Not.

_____
JAMES LAVERTY
Special Agent
Drug Enforcement Administration

Subscribed to and sworn before
me this 4th day of March, 2008

_____
GERALDINE SOAT BROWN
United States Magistrate Judge

8